UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) C.A. No. <br> LUK, INC., KAREEM JOLLY, DAPHNE WILLIAMS-HOLLEY, ) <br> MATTHEW MORAN AS GUARDIAN AD LITEM FOR ) <br> J. L, AND J. L.; ) <br> ) <br> Defendants. ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

1. This is an action for declaratory judgment seeking an order that the Philadelphia Indemnity Insurance Company owes neither defense nor indemnity to its insured Luk, Inc., nor to Luk, Inc.'s former employees, Kareem Jolly and Daphne Williams-Holley, under two insurance policies issued by Philadelphia Indemnity Insurance Company to Luk, Inc., with respect to the allegations set forth in a certain underlying suit, *Matthew Moran as Guardian ad Litem for Jack Loiselle, v. Massachusetts Department of Children and Families, et al.*, C.A. No. 1885CV01046 (the "Action"), that is currently pending in Massachusetts Superior Court, Worcester County,

2. In the Action, it is alleged that J. L. suffered significant bodily harm arising out of the extensive and grievous physical abuse by his father, Randall Lints ("Lints"), while J. L. was in the care of Luk, Inc., and its former employees, Kareem Jolly and Daphne Williams-Holley.

## PARTIES

3. The Plaintiff, Philadelphia Indemnity Insurance Company ("PIIC"), is a Pennsylvania corporation, with its principal place of business located at One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004.

4. The Defendant Luk, Inc., ("Luk") is a Massachusetts corporation, with its principal place of business located at 545 Westminster Street, Fitchburg, Massachusetts 01420-4727.

5. The Defendant Kareem Jolly ("Jolly") is a Massachusetts resident with a home address at 11 Wescott Street, Worcester, Massachusetts 01603.

6. The Defendant Daphne Williams-Holley ("Williams") is a Massachusetts resident with a home address at 3 Fatima Lane, Worcester, Massachusetts 01606.

7. The Defendant Matthew P. Moran ("Moran"), of the Law Offices of Matthew P. Moran, who is Guardian ad Litem for J. L., has a usual place of business located at the 225 Main St, Worcester, Massachusetts 01608.

8. The Defendant J. L. ("J. L."), is a Massachusetts resident and is a minor under the care and custody of the Massachusetts Department of Children and Families in Worcester County, Massachusetts.

## JURISDICTION AND VENUE

9. The United States District Court for the District of Massachusetts has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest or costs, and there is complete diversity between the parties to this action.

10. Venue is proper in this Court because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

## FACTS RELEVANT TO ALL COUNTS

11. The Complaint in the underlying Action was first filed in the Massachusetts Superior Court in Worcester County, on July 10, 2018.  The Complaint was not served on Luk, Jolly or Williams.

12. The First Amended Complaint in the Action was filed on September 18, 2019.  Luk was served with the First Amended Complaint on October 21, 2019; Jolly was served with the First Amended Complaint on October 28, 2019; and Williams was served with the First Amended Complaint on October 29, 2019.

13. In the First Amended Complaint, Moran is identified as the "guardian ad litem" to J. L..  On behalf of J. L., Moran brought the Action against the following persons and entities:  the Department of Child and Families ("DCF"), a department of the Massachusetts Executive Office of Health and Human Services; the Catholic Charities of the Diocese of Worcester; the Defendant Luk; and their respective various employees, including the Defendant Luk's former employees, Williams and Jolly.  J. L. is now under the full time care and custody of DCF.

14. On or about June 2014, Lints was given custody of his biological son J. L., and J. L. began to live with Lints in Hardwick, Massachusetts.  First Amended Complaint at paras. 12-13.

15. In or about September 2014, Jolly, who was employed at Luk as a Family Partner, began to work with Lints and J. L., initially meeting with them once a week, but then eventually only every other week, in the Lints home.  First Amended Complaint at para. 14.

16. On or about September 17, 2014, a "Chapter 51A" report was filed with DCF alleging physical abuse and neglect of J. L. by Lints.  First Amended Complaint at para. 15.

17. In or about October 2014, Williams, who was employed by Luk as an Intensive Care Coordinator, began to provide care services to Lints and J. L..  First Amended Complaint at para. 16.

18. On or about October 18, 2014, two Chapter 51A reports were filed with DCF alleging sexual assault of J. L. and J. L.'s alleged physical abuse of another child. First Amended Complaint at para. 17.

19. Additional 51A reports of a similar nature were filed with DCF in October and November 2014. First Amended Complaint at paras. 18-21.

20. At the end of 2014 or the beginning of 2015, Joseph Loiselle, J. L.'s maternal grandfather, reached out to Williams regarding concerns he had about J. L.'s lack of food, heat, clothing and socialization at the Lints home, and that Lints was denying him visits with J. L.. First Amended Complaint at para. 18-21.

21. Additional Chapter 51A reports were filed with DCF in January and February 2015 concerning ongoing abuse and neglect of J. L. by Lints. First Amended Complaint at paras. 23 and 25-27.

22. In January 2015, a DCF investigator spoke with Williams regarding J. L., and Williams told the investigator that she had no concerns of physical abuse by Lints of J. L. and that she hadn't noticed any other significant "red flags" about J. L.'s care by Lints. First Amended Complaint at para. 24.

23. Between January 2015 and July 14, 2015, numerous additional 51A reports were filed concerning J. L. and his potential neglect and abuse by Lints. First Amended Complaint at paras. 25 – 69.

24. A care services team meeting was held on March 27, 2015, that included the DCF social worker Amanda Maki, Lints, the mother of Lints' girlfriend, Kayla Robinson, a clinician, Alyssa Kempskie, a therapist from South Bay Mental Health, as well as Jolly and Williams, to discuss the concerns that had been raised about J. L. and his potential neglect and abuse by Lints. First Amended Complaint at para. 33.

25. Another team meeting was held on May 15, 2015, that included Jolly and Williams, to discuss concerns that had been raised about J. L. and his potential neglect and abuse by Lints.  First Amended Complaint at para. 37.

26. Both Jolly and Williams were allegedly providing positive reports of Lints.  First Amended Complaint at para. 46.  Joshua Finn, DCF Supervisor, apparently decided against seeking to remove J. L. from the Lints household because of these positive reports.  First Amended Complaint at paras. 46 – 47.  Another care services team meeting was held on June 23, 2015, that included Jolly and Williams, to discuss concerns that had been raised about J. L. and his potential neglect and abuse by Lints.  First Amended Complaint at para. 57.

27. On or about July 14, 2015, Lints called 911 and reported that J. L. was unconscious and not responding.  J. L. was taken to the hospital, and admitted to the pediatric intensive care in a coma, with acute renal failure and multisystem dysfunction likely due to dehydration and starvation with evidence of significant abusive trauma and burns to his feet and other bruising.  First Amended Complaint at paras. 70-78.

28. The DCF took emergency custody of J. L., who remained in a coma for several more months.  J. L. currently is unable to walk, stand, feed himself, or take care of himself.  He does not speak, and has had his vision seriously damaged.  He is at the Pappas Rehabilitation Hospital for Children in Canton, Massachusetts.  First Amended Complaint at paras. 70-78.

29. Lints was arrested, and he received a sentence of four to five years in state prison after pleading guilty to assault and battery on a child and two related counts.  Lints' live-in girlfriend, Alexandrea Chadwick, was also arrested and was sentenced to 2½ years in the House of Correction, with 18 months to be served, after pleading guilty in Worcester Superior Court to

one count of assault and battery on a child with substantial bodily injury and two counts of permitting substantial injury to a child.

30. In Count VI of the First Amended Complaint, Moran alleges that Williams was negligent in fulfilling her duty of care to the injured minor J. L. by failing to properly observe, monitor, evaluate, and report on J. L.'s health and welfare, including failing to report certain concerns raised by J. L.'s paternal grandfather regarding J. L.'s home living conditions, failing to properly evaluate and report on J. L.'s father controlling behavior, and her failing to properly observe J. L.'s loss of weight and the other adverse conditions in his home. First Amended Complaint at paras. 117 – 119.

31. In Count VI of the First Amended Complaint, Moran also alleges that Williams negligently provided positive reports about J. L. and his home life when she should have known that J. L.'s home conditions were "detrimental" to J. L.'s health and welfare. Moran also alleges that as a "direct and proximate result of the negligence and carelessness" of Williams, J. L. remained in the custody of his father Lints and suffered damages. First Amended Complaint at paras. 119 – 121.

32. In Count VII of the First Amended Complaint, Moran alleges that Jolly was negligent in fulfilling his duty of care to J. L. by failing to properly observe, monitor, evaluate, and report on the interactions between J. L. and his father, the conditions in the J. L.'s home and J. L.'s health and welfare. Moran alleges that Jolly was negligent because Jolly did not appropriately visit or keep in contact with the family, he did not appropriately evaluate or report on J. L.'s father controlling behavior, he did not properly observe and evaluate J. L.'s loss of weight, and he did not report that he had found J. L. alone and unattended on July 6, 2015. First Amended Complaint at paras. 122 – 124.

33. In Count VII of the First Amended Complaint Moran also alleges that Jolly negligently provided positive reports about J. L. and his home life when she should have known that that J. L.'s home conditions were "detrimental" to J. L.'s health and welfare.  Moran also alleges that as a "direct and proximate result of the negligence and carelessness" of Jolly, J. L. remained in the custody of his father Lints and suffered damages.  First Amended Complaint at paras. 125 – 126.

34. In Count VIII of the First Amended Complaint, Moran alleges that at all relevant times, Williams and Jolly were "acting within the scope of their employment" of Luk, and that as a result of the negligence of Williams and Jolly, "for whose conduct [Luk] is legally responsible," J. L. suffered damages.  First Amended Complaint at paras. 127 – 129.

## The PIIC Policies at Issue

35. PIIC issued to Luk the primary policy number PHPK1114067, with a policy period of December 31, 2013 to December 31, 2014 (the "Primary Policy").

36. The "Named Insured" under the Primary Policy is "Luk, Inc."

37. PIIC issued to Luk the umbrella policy number PHUB444645, with a policy period of December 31, 2013 to December 31, 2014 (the "Umbrella Policy")

38. The "Named Insured" under the Umbrella Policy is "Luk, Inc."

## Notice of the Claim

39. The first notice to PIIC concerning the claims alleged in the Action involving the injuries sustained by J. L., took place on October 23, 2019, in a notice received from the USI Insurance Agency ("USI") office in Bedford, New Hampshire, the insurance agent representing Luk, and its former employees Jolly and Williams (the "First Notice").

40. In the First Notice, USI tendered the claims to PIIC under the Primary Policy.  On October 25, 2019, a Loss Acknowledgement was sent by PIIC to USI.  On that same day, a Loss Acknowledgement Letter was sent to Luk by PIIC.

41. On October 25. 2019, PIIC learned from USI that the plaintiff in the underlying Action had made a settlement demand to the defendants in that Action of $15,000,000.

42. On November 15, 2019, USI sent a formal tender to PIIC of the claim involving the bodily injuries sustained by J. L. under the Umbrella Policy.

43. Soon after receipt of notice of the Action, PIIC provided a defense to Luk, Jolly and Williams in the underlying Action.

44. The claims set forth in Action against Luk, Jolly and Williams, were tendered to PIIC only under the Primary Policy and the Umbrella Policy (collectively, the "Policies").

45. No claim involving J. L.'s injuries has ever been tendered or reported to PIIC under any of the terms of any of the other PIIC policies that have been issued to Luk, other than under the Primary Policy and Umbrella Policy.

46. On or about August 27, 2020, PIIC sent letters to Luk, Jolly and Williams, in which PIIC stated that it would continue to provide a defense to Luk at this time with respect to the allegations set forth in the Action, subject to a full reservation of rights, however, with respect to whether there is any coverage available under the Policies for any potential liability of the Insureds relating to the injuries suffered by J. L. arising out of the abusive conduct of his father Lints while in the care of Luk, Jolly and Williams.

**The Primary Policy and Key Terms and Conditions**

47. The Primary Policy provides coverage, under certain circumstances, for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." Under the Primary Policy, PIIC has "the right and duty to defend the insured against any suit" seeking covered damages, but "will have no duty to defend" in any suit to which the Primary Policy does not apply.

48. This Primary Policy only applies to "bodily injury" that is "caused by an 'occurrence'" and if the "bodily injury . . . occurs during the policy period," in this case, between December 31, 2013 to December 31, 2014. In the Primary Policy, "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

49. The Primary Policy also provides that the insurance coverage "does not apply to . . . '[b]odily injury' . . . expected or intended from the standpoint of the insured," where "'[b]odily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

50. The Primary Policy also contains an "Abuse or Molestation" exclusion that precludes coverage for claims related to abuse or molestation. The exclusion provides that the Primary Policy "does not apply to 'bodily injury' . . . arising out of . . . [t]he actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or . . . [t]he negligent: (a) Employment; (b) Investigation; (c) Supervision; (d) Reporting to the proper authorities, or failure to so report; or (e) Retention; of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (a) above."

51. The Primary Policy contains the coverage form entitled "Human Services Organization Professional Liability Coverage Form," ("HSO Coverage Form") which provides coverage

"those sums that the insured becomes legally obligated to pay as 'damages' arising out of a 'professional incident' in the course of performing professional services for, or on behalf of, your human services organization to which this insurance applies."

52. The HSO Coverage Form also provides that PIIC has "the right and duty to defend any 'suit' seeking those 'damages',' but only where "the 'damages' result from a 'professional incident' that . . . occurs during the policy period."

53. The HSO Coverage Form contains an exclusion that provides that the Primary Policy's coverage "does not apply to 'damages' . . . [e]xpected or intended from the standpoint of the insured." The HSO Coverage Form also excludes damages "[a]rising out of

> a. The actual or threatened physical or sexual abuse or molestation by anyone of any person while in the care, custody or control of any insured; or
> b. The negligent: (1) employment; (2) investigation; (3) supervision; (4) reporting to the proper authorities, or failure to so report; or (5) retention of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by a. above."
> c. The negligent failure to provide professional services or neglect of the therapeutic needs of a client, patient or other person because of the conduct which would be excluded by paragraph a. above.

54. The Primary Policy also contains another coverage form entitled the "Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form" ("SPAM Coverage Form"). The SPAM Coverage Form provides coverage on a "claims-made" basis if the policyholder is alleged to be liable for another person's "abusive conduct" by reason of the insured's negligent employment, investigation, supervision, reporting to the proper authorities, or failure to so report, or retention of any employee for whom any insured is or ever was legally responsible.

55. Under this "claims-made" SPAM Coverage Form in the Primary Policy, the coverage only applies if the bodily injury at issue is caused by "abusive conduct" that takes place "during the policy period," and the claim for "damages" because of another person's "abusive conduct" is

reported to PIIC in writing not later than 60 days after the end of the policy period, in this case, December 31, 2014.

### The Umbrella Policy and Key Terms and Provisions

56. The Umbrella Policy contains a "General Liability Follow Form Endorsement," which provides in pertinent part that the "terms and conditions of the 'underlying insurance' are made a part of this policy, except with respect:  1. Any contrary provision contained in this policy; or 2. Any provision in this policy for which a similar provision is not contained in 'underlying insurance.'"

57. The Umbrella Policy also contains the exclusion endorsement entitled "Abuse or Molestation Exclusion," which provides that the Umbrella Policy does not "apply to any liability, damage, loss, cost or expense arising out of:

    > 1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured;
    > 2. The negligent: (a) Employment; (b) Investigation; (c) Supervision; (d) Reporting to the proper authorities, or failure to so report; or (e) Retention; of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by 1. above; or
    > 3. Any applicable coverage provided in the 'underlying insurance.'"

58. The Umbrella Policy contains no separate "Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form" and no separate "Human Services Organization Professional Liability Coverage Form."

### COUNT I – Against All Defendants
*Abuse or Molestation Exclusion*

59. PIIC incorporates by reference the allegations set forth in Paragraphs 1 through 58 as if fully set forth herein.

60. Luk, Jolly and Williams (collectively, the "Insureds") bear the burden of proving that their claims falls within the scope of coverage provided by the Policies.

61. Both the main coverage grants of the Policies as well as the specialized coverage grant under the Primary Policy's HSO Coverage Form are subject to exclusions for "abuse or molestation" claims, which provide that there is no coverage for any "bodily injury" that arises out of either: (a) any "actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured" or where the alleged negligent employment, investigation, supervision, reporting to the proper authorities, or failure to so report, or retention of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded under (a) above.

62. There is no coverage available to the Insureds under the Policies for the injuries that allegedly occurred in the First Amended Complaint because any potential liability of the Insureds for the injuries suffered by J. L. directly arose out of J. L.'s physical abuse by his father Lints while J. L. was "in the care of" the Insureds.

63. By its terms, the Abuse or Molestation Exclusion applies to damages arising out of physical abuse to "any person" (here, the minor child J. L.) caused by "anyone" (here, the child's father Lints) while that person (the minor child J. L.) was in the "care, custody or control" of the insured (here, the Insureds).  Here, the minor child J. L. was "in the care of" the Insureds, because J. L. was "in the care of" Jolly beginning in September 2014, and Williams beginning in October 2014, up through the time of J. L.'s hospitalization on July 14, 2015, during which time Jolly, Williams and Luk all provided care services to J. L..

64. As set forth in the First Amended Complaint, Jolly, as a Family Partner, "began to work with Lints and J. L., initially meeting with them once a week, but then eventually only every other week."  First Amended Complaint at para. 14.  Williams, as Intensive Care Coordinator, began to provide services to Lints and J. L. in October 2014.  First Amended Complaint at para. 16.  The

alleged facts further demonstrate that Jolly and Williams were providing "care" services to J. L. right up through his hospitalization, and as such, J. L. had been "in the care of" Williams and Jolly for over nine months.

65. Therefore, any potential liability of the Insureds as alleged in the First Amended Complaint in the Action relates directly to the injuries suffered by J. L. arising out of the physical abuse that he suffered at the hands of his father Lints while J. L. was in the care of the Insureds. As such, the Abuse or Molestation Exclusion contained in the separate endorsements to the Policies and as part of the Primary Policy's HSO Coverage Form, preclude any coverage under Policies for the allegations being brought against the Insureds in the First Amended Complaint.

66. Accordingly, PIIC has no duty to provide the Insureds with either defense or indemnification coverage to the Insureds with respect to the allegations set forth in the First Amended Complaint.

## COUNT II – Against All Defendants
*Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form*

67. PIIC incorporates by reference the allegations set forth in Paragraphs 1 through 66 as if fully set forth herein.

68. The SPAM Coverage Form attached to the Primary Policy - the "Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form" – provides coverage on a "claims-made" basis if the policyholder is alleged to be liable for another person's "abusive conduct" by reason of the insured's negligent employment, investigation, supervision, reporting to the proper authorities, or failure to so report, or retention of any employee for whom any insured is or ever was legally responsible.

69. Under this "claims-made" SPAM Coverage Form in the Primary Policy, the coverage is only triggered if the bodily injury at issue is caused by "abusive conduct" that takes place "during the

policy period," and the claim for "damages" because of another person's "abusive conduct" is reported to PIIC in writing not later than 60 days after the end of the policy period.

70. In the First Amended Complaint, it is alleged that at least some of the "abusive conduct" that resulted in J. L.'s bodily injury took place during the term of the Policies. In addition, the claims concerning J. L.'s injuries that took place as a result of his father's abusive conduct were not reported to PIIC until well beyond 60 days past the expiration date of the Policies.

71. The Primary Policy's SPAM Coverage Form endorsement requires that notice to the insurer be given no later than sixty days following the expiration of the policy period.

72. The first report to PIIC took place on October 23, 2019 in a notice received from USI tendering the claim involving injuries sustained by J. L., under the Primary Policy. On November 15, 2019, USI sent another formal tender of the claim involving injuries sustained by J. L., this time under the Umbrella Policy. As such, the claims at issue in the First Amended Complaint was first reported to PIIC more than four years after the end of the reporting period under the Policies.

73. Therefore, because the Insureds never reported the allegations against the Insureds set forth in the First Amended Complaint concerning their potential liability for J. L.'s injuries until well beyond 60 days past the expiration date, there is no coverage owed by PIIC to the Insureds under the Primary Policy's SPAM Coverage Form.

74. Accordingly, PIIC has no duty to provide the Insureds with either defense or indemnification coverage to the Insureds with respect to the allegations set forth in the First Amended Complaint.

**WHEREFORE**, PIIC respectfully requests that the Court:

a.  Declare that PIIC has no duty to provide the Insureds with either defense or indemnification coverage to the Insureds with respect to the allegations against them in the First Amended Complaint;

b.  Declare that the Abuse or Molestation Exclusion contained in the separate endorsements to the Policies and as part of the Primary Policy's HSO Coverage Form, precludes coverage under Policies for the allegations against the Insureds in the First Amended Complaint;

c.  Declare that because the Insureds never reported the allegations against the Insureds set forth in the First Amended Complaint concerning J. L.'s injuries until well beyond 60 days past the expiration date, there is no coverage owed by PIIC to the Insureds under the Primary Policy's SPAM Coverage Form;

d.  Enter judgment in favor of PIIC; and

e.  Grant PIIC such other relief as the Court deems just and proper.

> **PHILADELPHIA INDEMNITY INSURANCE COMPANY**
>
> By its attorneys,
>
> SULLOWAY & HOLLIS, P.L.L.C.
>
> */s/ Robert A. Whitney*
> Robert A. Whitney – BBO No. 545675
> rwhitney@sulloway.com
> (C) 617-335-1380
> 50 Cabot Street, Suite 204
> Needham, Massachusetts 02494

Dated:  December 10, 2020